BYRON K. STICKLE et al., respondents,

*v.*

HIGH STANDARD STEEL COMPANY et al., defendants.

[Argued March 16th, 1911.  Decided June 19th, 1911.]

1. To a bill filed to foreclose a vendor's lien for unpaid purchase-money, a bondholder, under a mortgage given by the purchaser, answered that the complainants had agreed to waive in his favor any and all rights they had to any part of the selling price of the lands so that the defendant would have a first and prior lien.—*Held*, that under the issue thus made, he must prove the waiver; and upon his failure to do so, the complainants were entitled to priority of payment.

2. The expression "vendor's lien" is an agreement by which the vendors assented to the making of a mortgage by the purchaser but provided that they should have a vendor's lien for unpaid purchase-money, sufficiently indicates a lien prior to the mortgage.

On appeal of Alfred W. Hoyt from a decree of the court of chancery advised by Vice-Chancellor Howell.

*Mr. John R. Hardin,* for the respondents.

*Mr. George G. Tennant,* for the appellant.

The opinion of the court was delivered by

SWAYZE, J.

The complainants seek to foreclose a vendor's lien upon property conveyed by them to the High Standard Steel Company, a New Jersey corporation, by deed dated October 1st, 1907. The appellant Hoyt claims to be a holder of bonds secured by mortgage, which bears even date with the deed and was given to the Carnegie Trust Company to secure a bond issue of $250,000. It contained a provision that the bonds should, upon demand of the steel company, be certified by the trustee and delivered to that corporation, or upon its order, but only upon presentation to the trustee of a resolution of the directors recommending the issue and requesting the certification and delivery of the bonds. The deed and mortgage were both recorded on November 15th, 1907. At the same time an agreement was entered into between the steel company and the present complainant, bearing even date with the deed and the mortgage. The steel company agreed to pay the complainants $105,000 as the consideration of the conveyance of which $50,000 was to be paid by five hundred shares of the steel company's stock of that par value, and the balance, as the agreement states, in cash,

"As follows: Said High Standard Steel Company will deliver to said Byron K. Stickle and George W. Stickle fifty-five of the coupon bonds of said High Standard Steel Company of the par value of one thousand dollars each, dated October 1st, 1907, and bearing interest at the rate of six per cent. per annum, payable semi-annually."

The agreement must mean that the $55,000 was to be paid in cash and the payment was to be secured by the bonds, since it would be extraordinary, if the language was taken literally, that the $55,000 was to be paid *in cash* as follows—that is, *by bonds.* The agreement further provided that the steel company should deposit with the Carnegie Trust Company the balance of the bond issue, $195,000, and

"That as said bonds so deposited are sold the proceeds of said sale shall be disbursed as follows, that is to say : *First*, to the repayment of twenty thousand dollars advanced to said High Standard Steel Company by . *Second*, to pay one-half of the remainder to said Byron K. Stickle and George W. Stickle until said amount of fifty-five thousand dollars with legal interest thereon from date, is paid. *Third*, the balance remaining thereafter to be paid to said High Standard Steel Company."

The Stickles agreed upon the payment of the $55,000 to surrender to the steel company the fifty-five bonds. The agreement further provided that the Stickles should have a vendor's lien upon the premises conveyed by them to the steel company to the extent of so much of said balance of $55,000, with interest, as should remain unpaid. The effect of this agreement undoubtedly was to preserve for the complainant the vendor's lien for purchase-money. It is manifest that the intent was not that the bonds should be taken in payment and satisfaction of the vendor's lien, but as collateral security therefor. Since a vendor's lien rests upon the theory that there is a constructive trust, and that the purchaser is a trustee of the land for the vendor until the purchase-money is paid (*Graves* v. *Coutant, 31 N. J. Eq. (4 Stew.) 763,* and cases there cited), it clearly must be prior to claims arising after the conveyance unless it is in some way cut out. As we said in that case, if the lien exists, it must be concurrent with the constructive trust and attach at the time the vendor obtains his right in the property. Since, however, it is only an equity, it cannot prevail against a subsequent *bona fide* purchaser for value. In this case the complainants, by parting with the title and in effect consenting to the making of a mortgage to secure an issue of bonds, assumed the risk that their lien for unpaid purchase-money might be supplanted by the rights of bondholders claiming under the mortgage if they took their bonds for value and without notice of the complainant's lien. The position of Hoyt is peculiar. He advanced $15,000 to the steel company upon two promissory notes, one for $10,000, dated April 20th, 1908, and one for $5,000, dated July 25th, 1908. Each note, after the ordinary words of promise to pay the amount, contained the following language :

"And as collateral security for the same to deposit with him or subject to his order with the Carnegie Trust Company of the city of New York, two hundred and forty-eight thousand dollars of the first mortgage, six per cent., twenty-year gold bonds of the High Standard Steel Company."

(The difference of $2,000 of bonds is explained by the testimony, but is immaterial for the present issue.) The resolution of the company under which the note of April 20th was issued, reads as follows:

"WHEREAS, The High Standard Steel Company has borrowed from Alfred W. Hoyt, of New York, a certain sum of money, and has agreed with him that until the repayment of the said sum of money no bond issued or to be issued under the terms of the mortgage of deed of trust given by this company to the Carnegie Trust Company, dated October 1st, 1907, shall be certified (excepting only bonds Nos. 1 and 2, which have already been so issued and certified), by the trustee and delivered to the said Steel Company or its order, except upon the consent in writing of the said Alfred W. Hoyt, and whereas the time for the payment of the said loan is on or before the 20th day of April, 1909,

"*Be it resolved*, That the Carnegie Trust Company be and it is hereby requested and instructed not to certify or deliver any of the said bonds so secured by the mortgage aforesaid (excepting only bonds Nos. 1 and 2 as aforesaid), except by the written consent of the said Alfred W. Hoyt."

The unusual feature in this arrangement is that the notes did not contain a distinct pledge of the bonds, but only a promise to pledge them, and the resolution, instead of directing the trust company to issue the bonds to Hoyt, as would have been natural in case they had in fact been pledged, merely attempted to put it in Hoyt's power to prevent the issue of the bonds without his consent. An examination of the agreement of October 1st, 1907, between the complainants and the steel company, suffices to explain the reason for this unusual method of doing business. Under that agreement the complainants were entitled to $55,000 of the bonds as collateral for the unpaid purchase-money; only the balance, $195,000, was to be left with the trust company to be disposed of for cash; and the utmost that the steel company could legally do, by way of security to Hoyt, was to transfer to him as collateral the $195,000 in bonds, or after deducting bonds Nos. 1 and 2, $193,000. In equity he was entitled to enforce the

promise of the steel company as far as they were able to perform it, but his equity to compel them to request the trust company to certify the bonds was later in time than the equity of the complainants to have the $55,000 in bonds delivered to them as collateral for their vendor's lien, and was necessarily subsequent in time to their equity to enforce the vendor's lien if they were able to do so. A question of fact is raised as to whether or not the complainants did not assent to or ratify the arrangement between the steel company and Hoyt, and there is much in the case which makes it seem probable that the complainants were willing that Hoyt should have all the advantage of the bonds and the mortgage that secured the same. It is unnecessary to pass upon this disputed question. The most that is claimed on behalf of Hoyt is a lien by virtue of the mortgage. That lien is inferior to the vendor's lien of the complainant unless Hoyt is a *bona fide* purchaser for value without notice. The evidence is to the contrary. By his answer he himself says:

"That some time in the month of April, 1908, this defendant agreed to make some advances provided he could be reasonably secured therefor, and was then assured by the said complainant that if this defendant would assist the company the complainants would agree that this defendant would be first paid the amount he would advance to said company, and that they, the said complainants, would waive any and all rights they had to any part of the selling price of the said lands and premises so that this defendant would have a first and prior lien for such advancement as he might make. And this defendant further charges that with this understanding he agreed to and did make advances to said company to the extent of fifteen thousand dollars. That the understanding of all parties concerned was that the mortgage to the Carnegie Trust Company and the issue of the bonds aforesaid, would secure this defendant for the advances so made by him."

This is a clear admission that prior to making his loan he knew that part of the purchase-money was unpaid to the complainant. If that were not so, the agreement that he should have the first and prior lien, upon which he relies, would have been quite unnecessary. He would have had this lien by virtue of the mortgage. He rests his case, not on lack of notice, but upon an agreement upon the part of the complainants to waive the priority of their vendor's lien. This waiver he fails to prove. The witness upon whom he relies goes no further than to say that the

complainants were willing to have the mortgage bonds pledged to raise this money, and he distinctly testifies that George W. Stickle said he was willing to have the lenders "secured to get the first money out of the sale of the bonds." He says that he told Hoyt that Stickle had said that he might pledge the bonds and that the company was authorized to pledge them. When the witness was asked what Stickle said about the priorities he answered, "That the security on the bonds is good and the property is valuable, worth more than fifty thousand dollars." Counsel for Hoyt was naturally not satisfied with this answer, and he repeated the question, to which the witness answered, "That the loan would be the first money that would be paid out of the bonds." Subsequently, he was asked,

"Q. Have you mentioned all the securities that Mr. Hoyt was to have for his loan to the company? A. Yes.

"Q. That is to say he was to have nothing more than the bonds. A. He was to have mortgage on the bonds. On the two hundred and fifty thousand, first mortgage, first lien."

Counsel for Hoyt then asked him: "Q. First lien on what? A. On the two hundred and fifty thousand mortgage bonds in the Carnegie Trust Company." This testimony obviously falls short of proving that the complainants have waived a lien that was superior to the mortgage and bonds, which, by special agreement, they had been so careful to preserve. The point of the testimony above quoted from Hoyt's witness, the man who had carried on the negotiations with Hoyt for the loan, is made apparent by his subsequent testimony that he told Hoyt that there was a contract that regulated the rights of the parties to these bonds. This could have meant only the contract of October 1st, 1907, and that specifically provided for the vendor's lien. This not only charged Hoyt with notice of the outstanding claim of the complainants for unpaid purchase-money, but it charged him with notice of their equity to have $55,000 of the bonds pledged as collateral, for the purpose of securing the unpaid purchase-money. With this knowledge, Hoyt was naturally anxious to have control of all the bonds. Taking the evidence most strongly against the complainants, it goes no further. This is insufficient to sustain the position taken in the answer that the complainants waived not

only their right to the bonds but all rights they had to any part of the selling price of the land. The claim of the complainants, under their vendor's lien, is therefore superior to the claim of Hoyt under the mortgage unless it has been lost in some other way. It is suggested, first, that the complainants agreed to take bonds in satisfaction of the purchase price, but the agreement of October 1st, the subsequent agreement upon the reorganization and the formation of the New York corporation, and all the testimony in the case is to the contrary. They were to have the bonds only as collateral for the unpaid purchase-money, and when that was paid, they were to return the bonds. It is not suggested that they took the promise to give bonds in satisfaction of the purchase-money, and unless they accepted the promise in satisfaction, there was no payment of the purchase-money even by the bonds; for these were never actually received by the complainants. Second, it is said that the agreement of October 1st, 1907, fails to provide for the priority of the claim for unpaid purchase-money. The suggestion is that although the agreement expressly says that the complainant shall have a vendor's lien to the extent of the unpaid purchase-money, this is not inconsistent with a lien subject to the mortgage to the Carnegie Trust Company. The expression "vendor's lien," used in the agreement, was an expression well known to our law as indicating a lien highly favored in our equity jurisprudence, which this court had said was based upon a constructive trust, arising at the instant of the conveyance. It cannot be held, in view of our decisions, that "vendor's lien" means a lien by contract subsequent in priority to a mortgage given by the vendee after the conveyance. Such a secondary lien would be contractual, arising out of the terms of the contract, and not a vendor's lien arising out of the rules of equity jurisprudence. The complainants, who had evinced so much anxiety to preserve this vendor's lien, could not have meant that it be postponed to a mortgage for $250,000. An inferior lien of that kind would be of less value than the security of the $55,000 bonds. If, however, the words "vendor's lien" are used in the agreement in their ordinary sense, there was a reason why the complainants should want in addition the $55,000 in bonds, for the vendor's lien might be supplanted by

the claim of a *bona fide* purchaser for value, and in that event, the $55,000 in bonds would be important to the complainants, and if the property were worth the mortgage, would suffice to secure the unpaid purchase price. Third, it is argued that the complainants have no lien because the purchase price has already been paid. The basis of this argument is that they took stock of the company to the amount of $50,000, and that the property was worth no more. The case shows that the complainants were willing to sell the property for $50,000 in cash; that when they found they were not to receive cash and that the steel company proposed to put a mortgage for $250,000 upon the property, they demanded more, and that it was finally agreed that they should be paid $105,000, of which $55,000 was to be in cash and $50,000 in the stock of the company. If this stock had been an original issue of stock by the company in exchange for the real estate conveyed by the complainant, an interesting question of stockholders' liability might have been presented, but such is not the fact. The steel company had been organized and this stock issued to Snyder, the promoter of the company, months before any negotiations with the Stickles, and the stock, instead of being issued for the real estate conveyed by the Stickles to the company, had been issued for patent rights and other property conveyed by Snyder or someone on his behalf. That Snyder was willing to use this stock that had already been issued to him for the patents and other property, for the purpose of benefiting the company in which he was largely interested, is not surprising. If there was an overissue of stock, it had nothing to do with the conveyance by the Stickles, and no evidence was offered to show that the patents for which this stock was issued were not worth the full amount of the par value of the stock. Fourth, the only argument that remains to be noticed is that the complainants are estopped to set up their claim for unpaid purchase-money. They did not negotiate with Hoyt nor did Birmingham negotiate on their behalf. He was acting as agent for the steel company; Hoyt was loaning money to the steel company. The utmost that can be claimed under the evidence, taking the most favorable view for Hoyt, is that the complainants led him to believe that he would have a first lien upon all of the mortgage bonds with

the exception of the two outstanding bonds. If this is conceded to him, the complainants still retain their vendor's lien, as we have already said.

We agree, therefore, with the vice-chancellor, and the decree is affirmed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, CONGDON, SULLIVAN—12.

*For reversal*—None.